**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**MARILYN GOODWIN, on behalf of,**
**JENNIFER ANN ATKINSON,**

       **Plaintiff,**

**v.**                                **Case No.: 2:14-cv-11582**

**CAROLYN W. COLVIN,**
**Acting Commissioner of**
**Social Security,**

       **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Jennifer Atkinson's application for a period of disability and disability insurance benefits ("DIB) under Titles II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and is referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 14, 17, 18).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on

the pleadings be **GRANTED;** the Commissioner's decision be **AFFIRMED,** and that

this case be **DISMISSED**, with prejudice, and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On November 29, 2010 and December 2, 2010, Jennifer Ann Atkinson,

("Claimant"), filed applications for DIB and SSI, respectively, alleging a disability onset

date of August 30, 2009, (Tr. at 297, 299), due to "manic depressive; psychological

disorders; chronic back pain; fibromyalgia; osteoarthritis; IBS; celiac disease;

migraines; gout; and hiatal hernia." (Tr. at 341). The Social Security Administration

("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at

121,128). Claimant then filed a request for an administrative hearing, (Tr. at 142), which

was held on April 18, 2012, before the Honorable Valerie A. Bawolek, Administrative

Law Judge ("ALJ"). (Tr. at 79-114). The hearing was continued to allow Claimant's

counsel time to obtain additional evidence, as well as to complete a psychological

consultative examination. The hearing resumed and concluded on September 19, 2012.

(Tr. at 45-78). By written decision dated November 8, 2012, the ALJ found that

Claimant was not disabled as defined in the Social Security Act. (Tr. at 23-36). On

December 14, 2012, Claimant filed a request for review by the Appeals Council. (Tr. at

19); however, Claimant died of a drug overdose prior to a decision. (Tr. at 336). Because

Claimant had no surviving spouse or qualified person to pursue the claim for SSI, on

January 9, 2014,[1] the Appeals Council dismissed the request for review of the SSI

application. (Tr. at 8-11). On the same date, the Appeals Council denied Claimant's

request for review of the DIB application; thereby, making the ALJ's determination of

---

[1] The file letter is dated January 9, 2013. Given that Claimant's date of death was June 23, 2013, the undersigned concludes that the Appeals Council accidently misdated the letter, and the correct dismissal date is January 9, 2014.

nondisability the final decision of the Commissioner. (Tr. at 12-15).

Claimant's mother, Marilyn Goodwin, filed the present civil action on behalf of her deceased daughter, seeking judicial review of the Commissioner's denial of the DIB application pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing the complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8 & 9). Plaintiff filed a Brief in Support of Judgment on the Pleadings, (ECF No. 14), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 17), to which Plaintiff filed a response. (ECF No. 18). Consequently, the matter is fully briefed and ready for resolution.

## II.   Claimant's Background

Claimant was 30 years old at the time that she filed the instant applications for benefits, and 32 years old on the date of the ALJ's decision. (Tr. at 23, 297, 299). She had a high school education and communicated in English. (Tr. at 83, 340). Claimant had previously worked as a cashier; cook; housekeeper; after-school teacher; clerical worker; teacher's assistant; and waitress. (Tr. at 83, 354-358).

## III.   Summary of the ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any

step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 404.1520(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to

perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through June 30, 2012. (Tr. at 25, Finding No. 1).

At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 30, 2009, the alleged disability onset date. (Tr. at 25, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "carpal tunnel syndrome, tachycardia, fibromyalgia, affective disorder, borderline personality disorder, and anxiety disorder." (Tr. at 25-27, Finding No. 3). The ALJ also considered Claimant's other impairments, including acute sinusitis, tooth abscess, venous insufficiency, migraines, and various gastrointestinal problems. (Tr. at 26). However, she found that these impairments were non-severe. (*Id.*)

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 27, Finding No. 4). Accordingly, she determined that Claimant possessed:

> [T]he residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). She cannot climb ladders, ropes, and scaffolds. She must avoid unprotected heights and other hazards such as dangerous machinery. She can only occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl. She should avoid excessive cold, heat, and vibration. She would be limited to simple job instructions. She should have only occasional contact with supervisors and only occasional and superficial contact with co-workers. She can work in proximity to the public but not in a public service capacity. She requires a job without a fast pace and without strict production quotas.

(Tr. at 28-34 Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 34, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 34-36, Finding Nos. 6-10). The ALJ considered that (1) Claimant was

born in 1980, and was defined as a younger individual age 18-49; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because using the Medical-Vocational Rules as a framework supported a finding that the Claimant is "not disabled," whether or not the Claimant had transferable job skills. (Tr. at 34-35, Finding Nos. 7-9). Taking these factors and Claimant's RFC into consideration, and relying on the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, (Tr. at 35-36, Finding No. 10), including work as a non-postal mail clerk; night cleaner; and night patrol inspector in the light unskilled exertional level, and as a basket filler, if limitations were placed on occasionally fingering and grasping. (Tr. at 35-36). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and thus was not entitled to benefits. (Tr. at 36, Finding No. 11).

## IV.   **Plaintiff's Challenges to the Commissioner's Decision**

Plaintiff raises three challenges to the Commissioner's decision. (ECF No. 14 at 10). First, Plaintiff alleges that the ALJ erred by not addressing Claimant's polysubstance use disorder, taking into account how that condition might have affected her ability to work and whether it was material to a disability determination. According to Plaintiff, the ALJ knew that Claimant used marijuana to treat her pain and anxiety, and the record contained evidence that Claimant suffered from opiate abuse and had received treatment for that disorder. Nevertheless, the ALJ did not recognize polysubstance abuse disorder as a severe impairment. This oversight tainted the ALJ's analysis, causing her to misuse the disorder as a means to discount Claimant's credibility, and as a smokescreen to misconstrue episodes of decompensation. (*Id.* at 11-

7

13). Second, Plaintiff argues that the ALJ failed to conduct a proper credibility analysis. Plaintiff contends the ALJ did not adequately explain her reasons for finding Claimant to be less than fully credible. (*Id.* at 15-16). Moreover, Plaintiff argues that the ALJ failed to consider Claimant's severe impairment of fibromyalgia when evaluating the validity of statements regarding the intensity and persistence of pain. Finally, Plaintiff asserts that although the ALJ included carpal tunnel syndrome as a severe impairment, she did not include limitations in the RFC finding that adequately addressed the functional consequences of this impairment. (*Id.* at 17). Specifically, Plaintiff believes the ALJ should have included restrictions in the RFC which would account for carpal tunnel syndrome, such as limits on fingering, handling, and grasping. (*Id.* at 17).

In response, the Commissioner maintains that substantial evidence supports the ALJ's RFC finding; noting the ALJ did accommodate Claimant's physical limitations by including less than a full range of light work in the RFC finding. (ECF No. 17 at 12-13). The Commissioner further argues that the ALJ acknowledged references of drug-seeking behavior and positive drug screens within the records; however, the records did not confirm a diagnosis of severe drug use, nor did the evidence support an opinion that Claimant was impaired from polysubstance abuse. The Commissioner points to records that indicate Claimant used marijuana largely to help her sleep, and according to a medical source statement completed by a psychologist, Claimant's drug use most frequently occurred during periods of unemployment and was not the primary cause of work limitations. (*Id.* at 16-17). Finally, the Commissioner emphasizes that the ALJ was not required to analyze the impact of substance abuse in Claimant's case because no finding of disability was made, and such a finding is a precursor to the analysis. In regard to the credibility analysis, the Commissioner claims that the ALJ properly

8

evaluated the credibility of the Claimant using the required two-step process, comparing Claimant's level of daily activities and treatment history to her subjective complaints. (*Id.* at 18). In the Commissioner's view, the limitations contained in the RFC finding demonstrate that the ALJ found some of Claimant's complaints to be credible. (*Id.* at 18-19). Finally, the Commissioner argues that the ALJ properly accounted for Claimant's carpel tunnel syndrome by limiting her to light work. Specific limitations related to Claimant's ability to finger or grasp objects were not appropriate given the lack of evidence in the record of Claimant's inability to finger or grasp objects. (*Id.* at 18).

## V.    __Relevant Medical Evidence__

The undersigned has reviewed the evidence in its entirety, including all of the medical records, and summarizes the relevant records below.

### A. Medical Treatment Records

On January 6, 2009, Claimant presented to Suzanne Gharib, M.D. for follow-up of fibromyalgia. Claimant reported improvement in muscle pain, having responded to increased doses of Lyrica with no side effects. She had no tender points at this visit. (Tr. at 890). Claimant told Dr. Gharib that her anxiety had increased even though she was being prescribed Cymbalta. Claimant stated that she had stopped taking the medication as it was making her depression worse. Claimant's medication list included Amitriptyline; Combivent inhalation aerosol; Lyrica; Nexium; Norflex; Relpax; Valium; and Zyrtec. (*Id.*) Her physical examination was unremarkable. (Tr. at 892). Dr. Gharib noted that Claimant's mood was normal with appropriate affect. She was assessed with fibromyalgia and livedo reticularis, a vascular condition that causes purplish mottling of the skin. Claimant's medications regimen as well as her exercise program was continued. Claimant was advised to return as needed. (*Id.*).

9

Claimant's treatment records with Bassam Haffar, M.D., begin on February 9, 2009. Dr. Haffar treated Claimant for epigastric pain; gastroesophageal reflux disease ("GERD"); internal hemorrhoids; celiac disease; and irritable bowel syndrome ("IBS") from 2009 through 2012.  (Tr. at Tr. at 535-539, 815-819). At the February 9, 2009, examination, Dr. Haffar diagnosed Claimant with fibromyalgia; arthritis; GERD; depression and anxiety; and tobacco use. (Tr. at 539). Claimant was advised to follow-up for treatment of GERD/dyspepsia. (*Id.*). The only other mention of fibromyalgia in Dr. Haffar's notes is in the record dated June 13, 2011, wherein Claimant was diagnosed with lower abdomen pain; constipation; IBS; and fibromyalgia. Claimant was advised to increase her fiber intake. (Tr. at 817).

Claimant presented to Cabin Creek Health Systems on April 8, 2009, for a routine visit. (Tr. at 587-588). Her problem list included tobacco abuse; migraines; rhinitis; joint pain; myalgia and myositis, NOS; insomnia; and chronic back pain. A review of systems was negative except for GERD and joint pain. A physical examination was normal with Claimant appearing alert and oriented. Claimant was advised to schedule a three-month follow-up appointment and to continue with her medications which included Lyrica, Reglan, and Xifaxan. (Tr. at 587).

Claimant was examined for her condition of fibromyalgia by Donna Burton, FNP-BC at Cabin Creek Health Systems on May 27, 2009. (Tr. at 585-586). A review of systems was negative for fatigue; anxiety, or depression; but positive for GERD and lumbar back pain. Physical examination was normal. (Tr. at 585). Claimant's medication included Amitriptyline; Combivent; Cyclobenzaprine; Lyrica; Nexium; Norflex; Relpax; Reglan; and Ultram. (*Id.*). Claimant was assessed with fibromyalgia. (Tr. at 586).

On August 18, 2009, Claimant presented to Cabin Creek Health Systems. She

reported that she was going to school and needed a physical examination. (Tr. at 583). Claimant told Nurse Burton that her fibromyalgia had improved since taking Lyrica but her insurance was no longer paying for the prescription Norflex. Her general physical examination was normal. (*Id.*). Claimant was assessed with fibromyalgia and GERD. (Tr. at 584).

Claimant returned to Cabin Creek Health Systems on April 6, 2010. (Tr. at 606). John Rice, PA-C, noted that Claimant was attending nursing school. Claimant presented wearing splints and complaining of pain due to carpel tunnel syndrome. Claimant was examined and assessed with fibromyalgia; carpel tunnel syndrome; allergic rhinitis; diverticulitis; nicotine dependence; lumbago; migraines; GERD; and questionable bronchospasm/asthma. Claimant was counseled on tobacco cessation. At this visit, Claimant received prescriptions for Norflex, Ultram, and Rhinocort Aqua. (Tr. at 607).

Physician's Assistant Rice examined Claimant again on June 14, 2010, noting that she had a rash from Ultram. (Tr. at 575). Claimant was still attending nursing school. She reported experiencing stress and stated that a psychiatric referral was currently pending. (*Id.*). Claimant's physical examination was normal. She was assessed with depression with anxiety; fibromyalgia; bronchospasm, questionable asthma; vitamin D deficiency; GERD; lumbago; diverticulosis; nicotine dependence; carpel tunnel syndrome; migraines; and allergic rhinitis. (Tr. at 576). Claimant was advised to continue current treatment in addition to keeping the psychiatric referral. (*Id.*).

Claimant returned to Cabin Creek Health Systems on March 5, 2010, for complaints of nasal congestion. Claimant's physical examination was normal other than tender sinuses with throat erythematous. Claimant's substance use history indicated alcohol and caffeine use; however, there was no indication for "street drug" use or

tobacco. (Tr. at 608). Claimant was diagnosed with acute sinusitis. (Tr. at 609).

Claimant presented to Cabin Creek Health Systems on June 14, 2010, for follow-up on carpal tunnel syndrome. (Tr. at 604). Physician's Assistant Rice noted that Claimant presented wearing splints, having previously been diagnosed with carpal tunnel syndrome. (*Id.*). Claimant was assessed with depression with anxiety; questionable post-traumatic stress syndrome; fibromyalgia; bronchospasm versus asthma; vitamin D deficiency; GERD; lumbago; diverticulosis; nicotine dependence; carpel tunnel syndrome; migraines; and allergic rhinitis. (Tr. at 604-605). Claimant subsequently received a referral to West Virginia University Psychiatric, as well as to Dr. Glenn Goldfarb, a neurologist. (Tr. at 602).

Glenn Goldfarb, M.D., performed an EMG on July 12, 2010, to investigate Claimant's complaints of numbness in the right second through fourth digits. Test results revealed median sensory latencies across the wrists were prolonged and amplitudes were low. The right median motor latency across the wrist was prolonged, but the left was normal. Claimant received a diagnosis of carpel tunnel syndrome, severe on the right, moderate on the left. (Tr. at 412).

Claimant returned to Cabin Creek Health Systems on August 17, 2010 for routine follow-up. (Tr. at 597). Physician's Assistant Rice listed Claimant's current health problems as vitamin D deficiency; migraine, unspecified, intractable; rhinitis due to pollen; celiac disease; insomnia; GERD; fibromyalgia; diverticulosis; carpal tunnel syndrome bilaterally; nicotine dependence; lumbago; marijuana and opiate abuse. (*Id.*). The drug abuse was listed as having an onset date of July 7, 2010; however, there are no other details pertaining to drug abuse in this medical record. (*Id.*). Claimant's physical examination was normal with the exception of numerous crusted erythematous papules

on her arms and legs. Claimant was diagnosed with scabies; celiac disease; fibromyalgia; lumbago; depression with anxiety; migraines; diverticulosis; vitamin D deficiency; allergic rhinitis; nicotine dependence; opiate and marijuana abuse; carpal tunnel syndrome; GERD; with questionable PTSD and asthma. (Tr. at 598).

Claimant presented to Charleston Area Medical Center on November 21, 2010, complaining of abscess teeth as well as upper right quadrant pain. (Tr. at 666). Karen Jiles, D.O., took a past medical history that included cholelithiasis; fibromyalgia; celiac disease; mood disorder; and depression. Claimant denied use of alcohol or illicit drugs. (*Id.*). Claimant was diagnosed with dental abscess. (Tr. at 667).

Claimant returned to Cabin Creek Health Systems on December 7, 2010 for a routine follow up. (Tr. at 563). She reported to Physician's Assistant Rice that her life had recently been threatened by a family member, and she had been hospitalized that same month after having a "nervous breakdown." (*Id.*). Claimant appeared oriented times three and her physical examination was unremarkable with the exception of abdominal tenderness in the right upper quadrant. (Tr. at 564). Claimant received a referral to Dr. Ted Jackson for carpel tunnel syndrome and was advised to cut back on smoking. (Tr. at 564).

Claimant presented to Dr. Jackson on December 20, 2010 as a referral for carpel tunnel syndrome. She complained of pain and paresthesias in both hands bilaterally, worse on the right side. (Tr. at 877). Dr. Jackson noted Claimant had a negative Tinel sign on the left; positive on the left [sic] and questionable at the elbow. The Phalen test was weakly positive bilaterally at fifty and sixty seconds. Additional medical issues made aware to Dr. Jackson included fibromyalgia. (*Id.*). Dr. Jackson found sensation on the right side was subjectively diminished in the ulnar distributions and equal in the left. He

13

felt the EMG demonstrated right severe and left moderate carpal tunnel syndrome. Dr. Jackson opined a carpal tunnel release would offer Claimant some relief. (Tr. at 878).

A few months later, on May 25, 2011, Claimant returned complaining of right knee pain and swelling, worse with ambulation, that was ongoing for the past three to four weeks. (Tr. at 874). Physician's Assistant Rice found Claimant's physical examination normal with the exception of mild abdominal tenderness in the left upper quadrant. Her mental status examination was also found normal. (Tr. at 875). Claimant received medication refills, including a prescription for Lyrica and Norflex and was advised to continue other treatments and to follow-up at Cabin Creek as scheduled. (Tr. at 876). Physician's Assistant Rice noted Claimant was receiving treatment from Dr. Haffar for continued left abdominal pain and Dr. Goldfarb for carpal tunnel syndrome. (Tr. 875).

Claimant returned to Dr. Jackson on January 4, 2012 for treatment of carpal tunnel syndrome. Dr. Jackson made note of Claimant's tobacco use and indicated there was no evidence of alcohol use. (Tr. at 878). Dr. Jackson sent a referral form to Dr. Susan Gharib on January 13, 2012, for the purpose of a rheumatology consultation; however, on January 17, 2012, he was advised Claimant was already a patient of Dr. Gharib. (Tr. at 879).

On January 23, 2012, Claimant presented to Suzanne Gharib, M.D. for follow-up evaluation of fibromyalgia. Claimant reported that despite taking Lortab and ibuprofen, the pain in her joints seemed worse with no improvement in her symptoms. (Tr. at 895). Claimant appeared tender diffusely, reporting to Dr. Gharib that the pain in her bilateral hands and mid forearm had worsened in addition to experiencing pain in the knees and feet. Claimant reported she had been diagnosed with bilateral carpel tunnel syndrome

by Dr. Ted Jackson who believed her joint pain was more diffuse advising her that he felt she might have tendinitis in the bilateral hands. (*Id.*). Claimant's past medical history included generalized abdominal pain; anemia during pregnancy; asthma; fibromyalgia; GERD, hypertension, benign essential; IBS; panic disorder and weight fluctuation. There was no change to Claimant's social history. She complained of fatigue and body aches though she appeared in no acute distress. (Tr. at 896). Claimant's mood was normal with appropriate affect. (*Id.*). Examination of the right and left wrists revealed no tenderness, swelling or deformities. There was full range of motion which was painless in all planes with no crepitance. Examination of both hands demonstrated diffuse tenderness to palpation but with no synovitis, and a full arc of motion in the small joints with no discomfort.   (Tr. at 896-897). Claimant was assessed with fibromyalgia and hand pain. Dr. Gharib advised her there did not appear to be any inflammation of the hands, and she felt tendinitis was very unlikely. X-rays of the hands were ordered. Claimant was advised to return if her symptoms became worse or continued to persist. (Tr. at 897).

By records of same date, Claimant presented to Thomas Memorial Hospital for x-rays of the hands as indicated by complaints of pain and swelling. (Tr. at 813-814). As to the right hand, there was a well circumscribed sclerotic focus along the lateral aspect of the proximal half of the second digit proximal phalanx measuring up to 1.3 cm. Patrick E. Hill, M.D., felt this to be benign appearing and felt it might be sequelae of prior non-ossifying fibroma. No other significant osseous, joint or soft tissue abnormalities were seen. (Tr. at 813). X-ray of the left hand revealed an enostosis in the distal ulna; however, Dr. Hill saw no other significant osseous, joint or soft tissue abnormalities. (Tr. at 814).

15

On January 31, 2012, MRI of the hands was performed at Thomas Memorial Hospital. (Tr. at 809-812). MRI of the right hand revealed interphalangeal joint space narrowing of proximal and distal interphalangeal joints. Dr. Jane Maloof advised correlation for underlying osteoarthritis as it was most pronounced in the second and third digits.  There also appeared mild degenerative changes at the base of the thumb at the carpometacarpal joints and metacarpophalangeal joints. It was noted that the carpal tunnel was incompletely included in the field of view; however, the portion of the median nerve seen was unremarkable. (Tr. at 809-810). MRI of the left hand revealed narrowing of interphalangeal joints, particularly the proximal of index and middle fingers. The carpal tunnel was incompletely included from view; however, Dr. Maloof felt the portion seen was unremarkable. (Tr. at 811-812).

Claimant returned to Cabin Creek Health System on February 13, 2012 for examination by Physician's Assistant Rice. Claimant reported treatment with Dr. Otellin, who had increased her prescription of Buspar to 15 mg.  Claimant was already taking 5 mg Buspar, and the increase dosage had resulted in clinical improvement.  (Tr. at 858). Claimant's physical examination was normal, except for faint expiratory rhonchi that cleared with coughing and an abnormal heart rate on auscultation. (*Id.*). Claimant was told to increase Buspar to 20 mg and continue with her other treatments. (Tr. at 859).

On February 15, 2012, Claimant returned to Dr. Gharib for follow-up. Claimant expressed no change in her fibromyalgia symptoms despite medication, except she did report improvement with the pain in her hands. (Tr. at 902). Her current medications included hydrocodone-acetaminophen, Lyrica, ibuprofen, and Norflex. Dr. Gharib reviewed the results of the MRI taken of Claimant's hands, seeing no evidence of

inflammatory changes in either joints or tendons; however, there appeared to be evidence of mild joint space narrowing. (*Id.*).  Claimant appeared alert and in no acute distress and displayed a normal mood as well as appropriate affect. (Tr. at 903-904). Examination of the wrists revealed no tenderness, swelling or deformities. Both wrists had full range of motion, and were painless in all planes with no crepitance. An examination of the hands revealed diffuse tenderness to palpation, but no synovitis. Both hands had full arc range of motion in the small joints, with no discomfort elicited. (Tr. at 904). Claimant was assessed with fibromyalgia and hand pain. Dr. Gharib documented the lack of evidence of inflammation as the cause of the hand pain. Claimant was instructed to return for re-evaluation after her carpal tunnel release surgery and rehabilitation. (*Id.*).

Claimant returned to Dr. Gharib on March 8, 2012 for treatment of fibromyalgia. She complained of diffuse swelling in the elbows and knees with no improvement in her symptoms. (Tr. at 905). Claimant reported that the swelling had occurred for several days and had since improved, but she still experienced pain. (*Id.*). Claimant's social history was reviewed, with no changes, and she appeared alert and in no acute distress. An examination of her elbows revealed diffuse tenderness to palpation, but no synovitis, with a full range of motion that was painless in all planes and without crepitance. (Tr. at 906). Examination of the ankles and feet exhibited diffuse tenderness to palpation, but no synovitis. Range of motion was full and painless in all planes. (Tr. at 906-907). Claimant was diagnosed with fibromyalgia, hand and foot pain. As the foot and elbow examination appeared normal, Dr. Gharib ordered x-rays advising Claimant to return if symptoms worsened or persisted. (Tr. at 907).

Ted Jackson, M.D., performed a carpel tunnel evaluation followed by a right

carpal tunnel release on March 14, 2012. Claimant was discharged in good condition. (Tr. at 880-881). Dr. Jackson performed a left carpel tunnel release on May 2, 2012. (Tr. at 1053). Once again, Claimant was discharged in good condition.

Claimant returned to Cabin Creek Health Center on April 5, 2012, requesting an increased dosage in medication taken for stomach issues. (Tr. at 1038). Claimant complained of an recent increase in indigestion in addition to reporting increased discomfort in her legs. She also requested an increase in Lyrica. Physician's Assistant Rice noted that Claimant was recently diagnosed with SVT. Her physical examination was normal with the exception of faint expitarory rhonchi which cleared upon coughing. (Tr. at 1039). Claimant was provided with prescriptions for Lyrica, Toprol, Claritin, Prilosec, buspirone, and Norflex. (Tr. at 1040).

On August 6, 2012, Claimant returned to Cabin Creek Health Systems for follow-up to recent complaints of chest pain. (Tr. at 1016). She reported to Physician's Assistant Rice that she had seen Dr. Gharib in early March, 2012 and was diagnosed with possible early onset of rheumatoid arthritis of the hands, and with arm pain that was most likely due to fibromyalgia. Claimant appeared alert and oriented with a normal cardiovascular examination. (Tr. at 1018). Claimant was advised to continue treatment prescribed by her medical providers; attempt to quit smoking; and follow-up in one month. She also received a referral to Dr. Tucker, a vascular surgeon. (*Id.*). Her current medications included Amitriptyline; Bentyl; Buspirone; Celexa; Claritin; Combivent; Fish Oil Omega; hyoscyamine; Lofibra; Lyrica; mirtazapine; Nasonex; Nicotrol; nitroglycerin; Norflex; Prilosec; Reglan; stool softener; Toprol XL; Valium; and Zyprexa. (Tr. at 1016).

### B. Mental Health Treatment

On June 1, 2001, Claimant was admitted to Highland Hospital under the care of

Mark Hughes, M.D., with complaints of increased depression and suicidal ideation with plans to commit suicide. (Tr. at 1050). A physical examination performed June 2, 2001 by Joanne Dalyrymple, M.D., revealed episodes of blurred vision, likely due to fatigue; left-sided chest pain with heart palpitations, sometimes accompanied by sweats and nausea; status post colposcopy; and upper respiratory infection. Claimant's drug screen was positive for marijuana use. (*Id.*). Dr. Hughes noted Claimant had received treatment in April, but had neglected to follow-up with outpatient care, although she was compliant with the prescribed medication. (Tr. at 1051). By June 6, 2001, Claimant had improved and was moved to Level II of the treatment facility. However, the following day she was not doing well. She had become distraught after being served with a domestic violence petition. On June 11, 2001, Dr. Hughes felt Claimant was not exhibiting suicidal ideas. She appeared to be doing well with no evidence of psychotic symptoms. He opined that Claimant was stable enough for discharge to Sojourners Shelter until housing could be found for her. At the time of discharge, Claimant was diagnosed with major depressive disorder and marijuana use. Her discharge medications included Vistaril, Buspar, Zoloft, and Remeron. (*Id.*). Claimant was advised to follow-up with Dr. Hughes later that month. (Tr. at 1052).

Claimant was admitted to Thomas Memorial Hospital on October 18, 2010, with complaints of depression and suicidal ideations and plans. (Tr. at 782-785). Her past medical history included GERD; asthma; fibromyalgia; bilateral carpal tunnel syndrome; osteoarthritis; celiac disease; diverticulitis; and traumatic head injury as a result of a motor vehicle accident. Claimant reported she smoked a pack of cigarettes a day; used alcohol infrequently; and used recreational drugs in the form of marijuana. (Tr. at 782). Claimant complained of constant fever as well as headaches; dizziness;

orthostatic hypotension; chest pain and tachycardia episodes, which she attributed to anxiety. (Tr. at 783). Claimant further complained of paresthesias in both hands, which she attributed to carpal tunnel syndrome. She reported having episodes of depression and anxiety; although she denied seizures and visual or auditory hallucinations. (*Id.*). Her initial diagnoses included anxiety; depression; suicidal ideation with plan; GERD; asthma; fibromyalgia; celiac disease; and history of head trauma. (Tr. at 784-785).

Alexander V. Otellin, M.D., conducted an initial psychiatric evaluation of Claimant on October 19, 2010, and attended Claimant daily throughout her hospitalization.   (Tr. at 786-789, Tr. at 771-779). Claimant reported her depression began gradually, causing daily episodes of irritability, decreased energy, sadness, worry, insomnia, and suicidal ideas with intent. (*Id.*). Claimant's medical history was positive for complaints of generalized muscle aches. Claimant reported a history of marijuana abuse, as it helped her to "stay calm," although she denied using marijuana when taking medications that relieved her symptoms, such as Zyprexa. (Tr. at 787). Dr. Otellin noted that Claimant had a history of manic symptoms lasting seven days or longer. (*Id.*). A physical examination revealed normal muscle strength and tone, gait and station. (Tr. at 788). Claimant was friendly and fully able to communicate, although she appeared anxious and unhappy. Her cognitive functioning, short and long term memory, and social judgment were intact. Claimant was diagnosed with bipolar 1, most recent episode mixed and severe, without psychotic features. Claimant was prescribed Zyprexa. (Tr. at 788-789).

Dr. Otellin examined Claimant on October 21, 2010, noting that she showed an inadequate response to treatment. Claimant reported she was depressed; although she felt Zyprexa and Valium helped with her symptoms. (Tr. at 771). Upon examination,

Claimant exhibited chronic depressive symptoms, although her racing thoughts were less frequent and intense, and the manic process had lessened. She continued to exhibit symptoms of post-traumatic stress disorder ("PTSD"). Claimant's cognitive function and social judgment remained intact. (Tr. at 772). Claimant was diagnosed with bipolar 1, most recent episode mixed, severe, without psychotic features, and PTSD. Dr. Otellin ordered an increase in Zyprexa and Valium, as well as the addition of Cogentin and Remeron. (Tr. at 773). The following day, Dr. Otellin observed that Claimant appeared motivated, showing a slight improvement to treatment. (*Id.*). Claimant was coherent, friendly and happier, although she continued to exhibit signs of depression and anxiety. (Tr. at 773-774). Her cognitive function, social judgment, short and long term memory remained intact. On October 23, 2010, Claimant told Dr. Otellin she needed Buspar as she was more upset and "not ready to go home." (Tr. at 775).

On October 24, 2010, Claimant reported to Dr. Otellin she felt less depressed and was sleeping well. (Tr. at 461). She described her anxiety symptoms as less frequent and less intense, believing those symptoms had improved. Claimant appeared friendly and relaxed, exhibiting normal, coherent speech. Dr. Otellin observed signs of severe depression as Claimant's thought content was depressed due to suicidal ideations, although suicidal intention was not present. (Tr. at 481-482). By the next day, Claimant expressed to Dr. Otellin that she felt more depressed and anxious. (Tr. at 458, 776). Dr. Otellin felt that Claimant had exhibited only a minimal response to treatment as she continued to display symptoms of depression and anxiety. However, she remained fully oriented, with cognitive function intact. (*Id.*). (Tr. at 459, 777). On October 26, 2010, Claimant informed Dr. Otellin she had slept very well and believed she was gaining back confidence. (Tr. at 456, 777). Dr. Otellin noted that Claimant's symptoms of depression

had decreased as had her sleep problems, feelings of sadness, and difficulty in thinking and making decisions. (*Id.*). Claimant was discharged from Thomas Memorial Hospital on October 27, 2010. (Tr. at 451-455, 779-781). Dr. Otellin opined that Claimant was stable and showed no outward signs of depression, psychosis, or suicidal ideas. (*Id.*). Claimant displayed appropriate thought content and cognitive functioning. (Tr. at 452, 780). Dr. Otellin felt that Claimant had made great improvement, and her prognosis was good. (*Id.*).

However, on October 31, 2010, Claimant returned to Thomas Memorial Hospital complaining of depression and suicidal thoughts. (Tr. at 749). Robert Romaine, M.D. documented that Claimant had experienced situational problems, but had not exhibited any behavioral changes. She appeared to be compliant with her medication. (*Id.*). Dr. Romaine did note recent drug use, but Claimant did not appear to have consumed alcohol. Lab reports were positive for benzodiazepine, opiates, and marijuana. (Tr. at 750, 764). Claimant was admitted for a psychiatric evaluation in stable condition. (Tr. at 752). Dr. Hussein performed a psychiatric evaluation, noting that Claimant reported being abused by her boyfriend who "tried to kill her and dragged her out of the car." (Tr. at 757). Dr. Hussein diagnosed Claimant with bipolar, mixed, on Axis I; personality disorder, not otherwise specified ("NOS"), on Axis II; and GERD, asthma, fibromyalgia, celiac disease and diverticulitis on Axis III. (Tr. at 760). Dr. Otellin examined Claimant, as well, indicating that she complained of low and mid back pain as a result of a physical assault by her boyfriend that had occurred the day prior to admission. (Tr. at 753). Dr. Otellin documented that Claimant had a history of illicit drug use in the form of marijuana; however, Claimant told him she had recently stopped smoking marijuana. Dr. Otellin admitted Claimant for treatment with an assessment of bipolar, mixed

disorder, and depression due to being a victim of abuse. (Tr. at 756).

Dr. Otellin examined Claimant on November 1, 2010, recording that she appeared unstable with no response to treatment. Despite Claimant's denial that she was using opiates and marijuana, Dr. Otellin suspected drug abuse and felt Claimant's reason for returning to the hospital was drug-seeking behavior. (Tr. at 417). He noted that Claimant's initial request to him was for a shot of Toradol. Claimant reported increased symptoms of depression; however, she convincingly denied suicidal ideas. In addition, she complained of generalized muscle aches. Upon examination, Claimant's affect was congruent with her mood and appeared appropriate to verbal content. Her cognitive functioning remained intact. Claimant's diagnoses were unchanged. (*Id.*). After two days, Claimant asked to be discharged. Dr. Otellin indicated that Claimant planned to return to her mother's home and, as she was compliant with the treatment program exhibiting no medication side effects, Claimant was discharged on November 3, 2010 with improved condition and fair prognosis. (Tr. at 423-426).

On November 8, 2010, Claimant presented to Thomas Memorial Hospital. Andrew Cook, D.O. examined Claimant, finding her in no acute distress, with normal speech, mood, and affect, although she reported that she had taken Remeron and it made her sleepy. (Tr. at 734). Claimant's social history was positive for tobacco use, but not for alcohol or drug use. (*Id.*). Nevertheless, a drug screen revealed Claimant was positive for benzodiazepines, as well as marijuana. (Tr. at 735, 741-742). Claimant was assessed with depression. (Tr. at 736).

The following day, Claimant returned to Thomas Memorial Hospital. (Tr. at 729-730, 744-748). Claimant reported she was attacked by a family member, and her mother advised her to come to the hospital to get help, or she would be homeless. (Tr. at 745).

Claimant alleged that her brother stole her Valium. She also stated that since her last admission, she had been unable to obtain her medication. It was documented that during this interview, Claimant was evasive and kept changing her story. Upon examination, Claimant appeared guarded and defensive. She was disheveled, but oriented times four. Her mood was depressed and her affect flat. (Tr. at 747). Claimant was assessed as irrational, illogical, with poor coping skills and poor judgment. She had suicidal ideation with a plan and was not able to commit to safety. Behaviorally, she was fighting, non-compliant, and exhibiting drug use. Claimant was diagnosed with depressive disorder and personality disorder. (Tr. at 748).

Records from Prestera Centers for Mental Health ("Prestera") begin on November 9, 2010 with a psychiatric assessment and treatment that concluded on November 22, 2010. (Tr. at 914-929). Claimant reported a history of periodic substance abuse in the form of marijuana. (Tr. at 918-919). Claimant appeared disheveled and inhibited, with pressured speech. (Tr. at 922). Claimant's presenting problems were mental illness, suicidal thoughts and/or attempt, and lack of housing. (Tr. at 923). Claimant complained of depression and suicidal thoughts that had worsened after having first manifested at age twelve. (Tr. at 944). She was diagnosed with major depressive disorder, recurrent, severe without psychotic features, and PTSD on Axis I. Claimant was diagnosed with borderline personality disorder on Axis II. (Tr. at 948).

On November 13, 2010, Claimant indicated she felt somewhat better although she requested the prescription for nighttime Valium be increased to help her sleep. (Tr. at 464). Her mood was labile, and she reported being compliant with her medication regimen as well as denying any substance abuse. Claimant appeared unkempt and withdrawn with slurred speech and tangential thought content. (*Id.*). Andy Tanner,

M.D., noted that Claimant was very reluctant to decrease her Valium dosage, stating her brother had stolen her medicine. Dr. Tanner opined that Claimant was probably dependent on benzodiazepines. He decided to decrease the dose of Valium and closely monitor Claimant. (Tr. at 466).

On November 15, 2010, Claimant was examined by Mohammed Elawady, M.D., who documented Claimant's mood as depressed, anxious, labile, and tearful, with her focus on Valium. (Tr. at 477). He noted that Claimant did not sleep well and became sedated upon receiving Depakote. Her appearance, sociability, and thought content were within normal limits, although her speech was slurred. (Tr. at 477). Dr. Elawady changed the prescription Depakote to 1500 mg qhs and Zyprexa 20 mg qhs. He also added Trazodone to the medication regimen. (Tr. at 479).

Claimant next saw Dr. Elawady on November 16, 2010. She reported that Depakote increased her sadness and felt that Zyprexa better controlled her mood. (Tr. at 481). She had complained of abdominal pain and was sent to the emergency department for treatment. On this date, Claimant appeared withdrawn with flight of ideas, although her appearance and speech were within normal limits. (481). Her affect was labile, and she presented with normal coping ability. (Tr. at 482). Dr. Elawady elected to stop Depakote and increase Zyprexa to 30 mg. (Tr. at 483).

On November 17, 2010, Claimant complained of occasional abdominal pain in between Lortab dosage. (Tr. at 486). Her appearance and sociability were within normal limits, but her speech was rapid and she exhibited flight of ideas. (Tr. at 486). Claimant was prescribed Motrin 400 mg as needed for pain. (Tr. at 488).

On November 18, 2010, Claimant was assessed by Dr. Elawady and Van S. Pratt, R.N. (Tr. at 491, 930-943). Dr. Elawady described Claimant as medication-seeking

regarding Valium; impulsive with unstable mood; displaying sadness, irritability, and racing thoughts; easily tearful; intrusive; and easily overwhelmed. (Tr. at 491). In addition, she displayed rapid speech; thought blocking; hyperactivity; and overwhelmed in ability to cope. (Tr. at 491-492). Dr. Elawady continued Claimant's current medication regimen and therapy. (Tr. at 493).

The following day, Claimant was seen by Dr. Elawady, who noted that Claimant continued to be sad, with racing thoughts; displaying euphoria at times, attention-seeking behaviors and intermittent episodes of crying. Her appearance, sociability, speech, and thought content were within normal limits. (Tr. at 496). Dr. Elawady made no change to Claimant's medication regimen or therapy. (Tr. at 498).

On November 20, 2010, Claimant continued to have depression, denying suicidal ideations, reporting she felt the group therapy sessions were helping her to achieve coping skills. (Tr. at 501). Physically, she complained of an increase in restless legs with increased Zyprexa dosage. (Tr. at 501). Her appearance was disheveled while her sociability was inhibited and her speech slurred. (*Id.*). She presented with a flat affect and deficient coping skills. (Tr. at 502). Zyprexa was decreased to 2 mg at bedtime while Celexa 20 mg daily was added to her medication regimen. (Tr. at 503).

On November 21, 2010, Claimant continued treatment at Prestera, expressing to Jeffrey Ashley, M.D., that she felt better, was less sedated and less depressed. (Tr. at 505). She believed the Celexa and reduction in Zyprexa helped her symptoms. Her appearance, sociability, speech, and thought content were all within normal limits. (*Id.*). Dr. Ashley continued her current treatment plan observing she might be in a position for discharge the following day. (Tr. at 507). The following day, Nurse Van Pratt documented that Claimant was transported to Charleston Area Medical Center with

complaints of tooth pain. She was admitted for surgery and, upon discharge, elected to return home with her mother. As a result, she was discharged from Prestera with the comment that she had dropped out of treatment (Tr. at 950).

Claimant was examined by Dr. Otellin on November 30, 2010.  He found that Claimant showed slight improvement. (Tr. at 413). Claimant did not display signs of mania, hallucinations, or delusions. The symptoms of depression were improved as they had lessened in frequency as well as intensity, and Claimant was better able to tolerate stress. Dr. Otellin recorded Claimant's history of marijuana abuse. She told him it helped her stay calm and that she did not smoke it when she was taking medications that helped her, such as Zyprexa. (*Id.*). Her current medical diagnoses included fibromyalgia, celiac disease, GERD, and IBS. Upon examination, Claimant had no serious mental status abnormalities. (Tr. at 415). Claimant demonstrated normal speech and logical thought content. Her cognitive function was intact, as was judgment and insight. She demonstrated normal muscle strength, tone, gait, and station. Claimant retained her diagnosis of bipolar 1, most recent episode mixed, severe without psychotic features, and PTSD. (Tr. at 415). Claimant was instructed to return in six to eight weeks, or earlier if needed. (Tr. at 416).

### C. Evaluations and Opinions

On January 20, 2011, Paula J. Bickham, M.D., completed a Psychiatric Review Technique, finding Claimant's impairments in the categories of affective, anxiety-related, and substance addiction disorders to be non-severe. (Tr. at 511-524). As to affective disorders, Claimant received a diagnosis of bipolar syndrome, (Tr. at 514), and her diagnosis in the category of substance addiction disorders was cannabis abuse. (Tr. at 519). Dr. Bickham found Claimant had a mild degree of functional limitations with

activities of daily living; maintaining social functioning; and maintaining concentration, persistence, and pace; and had one or two episodes of decompensation. (Tr. at 521). Dr. Bickham did not believe the evidence established paragraph "C" criteria. (Tr. at 522). Dr. Bickham recorded Claimant's activities of daily living as including taking children to school; preparing complete and quick daily meals; doing household chores; going outside daily; driving; shopping several times weekly; and the pursuit of coin collection as a hobby. Claimant had expressed problems with all aspects of mental functioning. Dr. Bickham found her to be only partially credible. (Tr. at 523). While Dr. Bickham took note of Claimant's history of mental health hospitalizations, continued treatment with a psychiatrist, and current psychotropic medication regimen, Claimant's possible drug-seeking behavior was a factor in discounting her credibility. In addition, at her last office visit on November 30, 2010, Claimant's treating physician deemed all areas of Claimant's cognitive functioning to be within normal limits, which was inconsistent with Claimant's statements of disabling symptoms. (*Id.*). Dr. Bickham's Psychiatric Review Technique was affirmed by James Binder, M.D. on February 18, 2011. (Tr. at 534-534).

Carl Bancoff, M.D., completed a Physical Residual Functional Capacity Assessment on January 24, 2011. (Tr. at 525-532). Claimant's primary diagnoses were celiac disease and GERD, with secondary diagnoses of spinal disorder (fibromyalgia) and other impairment of joint dysfunction. (Tr. at 525). Dr. Bancoff found Claimant could occasionally lift twenty pounds; frequently lift ten pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and had an unlimited ability to push and/or pull. (Tr. at 526). Claimant could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. at 527). She had no manipulative, visual, or communicative limitations. (Tr. at 528-529). As to

28

environmental limitations, Claimant should avoid concentrated exposure to extreme cold and heat; fumes, odors, dusts, gases, and poor ventilation; and hazards such as machinery and heights. (Tr. at 529). Dr. Bancoff felt Claimant's symptoms were only partially credible. (Tr. at 530).

Caroline Williams, M.D., also submitted a case analysis on March 11, 2011, recording that she had conducted a file review, and noting that Claimant had alleged no changes to her conditions; no new illness, injury, or medications. Consequently, there was no new medical evidence since the last RFC assessment. Dr. Williams considered Dr. Bancoff's Physical Residual Functional Capacity Assessment and, concluding that it was correct, she affirmed it. (Tr. at 554).

Lester Sargent, M.A., performed a Mental Status Examination of Claimant on June 21, 2012 at the request of the SSA. (Tr. at 998-1004). Mr. Sargent observed that Claimant's posture was straight, and she exhibited a normal gait when she arrived for her examination. (Tr. at 998). She reported to Mr. Lester that she was applying for benefits because of "my health and my mental status." She expressed psychological problems that began in childhood and were associated with abuse. Claimant also stated, "they want me to see a pain management doctor but I would not go because I do not want needles in my spine." She claimed that she could not stand or sit for long periods, and her joint were deteriorating. (Tr. at 999). Claimant complained of a history of recurrent major depressive episodes as well as manic episodes consistent with a diagnosis of bipolar disorder. Recently, she had experienced frightening dreams; disturbed sleep; loss of interest in activities; feelings of helplessness; pessimism; crying; agitation; frustration; irritability; and thoughts of death. (*Id.*). She told Mr. Lester she frequently used marijuana and had started using it at age nine. (Tr. at 999, 1001).

Claimant reported that she used marijuana for pain relief and as a sleep aid with her longest period of abstinence being seven months. However, she did not report any treatment for substance abuse. (Tr. at 1001). Claimant expressed to Mr. Lester that there were days when her pain level caused her severe problems with moving from one room to another. (Tr. at 1000).

On mental status evaluation, Claimant was found to be cooperative and oriented times four. Her mood was markedly sad with a constricted affect. Her thought process was coherent with no evidence of paranoia, delusions, obsessions, or compulsive behavior. (Tr. at 1001). Claimant's immediate and remote memory was within normal limits; however, her recent memory appeared mildly impaired. Claimant's concentration was also mildly impaired; her persistence appeared normal; and her pace was slow based upon observation. (Tr. at 1002). Claimant's social functioning seemed moderately impaired when observing her distant eye contact, sense of humor, and mannerisms. Claimant was diagnosed with bipolar disorder 1, most recent episode depressed, moderate without psychotic features; nightmare disorder; cannabis abuse; pain disorder associated with both psychological factors and a general medical condition on Axis I. She received an Axis III diagnosis of history of fibromyalgia; arthritis; IBS; migraines; gout; GERD; and diverticulitis. (*Id.*). Mr. Lester noted Claimant went to the store twice a month and performed other weekly errands. She could complete all basic living activities independently. She did her own housework, cooking, laundry, and dishes; however, she told Mr. Lester she had to take frequent breaks when performing chores. Mr. Lester felt Claimant's prognosis was poor, although he believed she would be capable of managing her own funds. (Tr. at 1003).

By report of same date, Mr. Lester completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. at 1006-1008). Mr. Lester believed Claimant was mildly restricted in understanding, remembering, and carrying out simple instructions. (Tr. at 1006). She was moderately restricted in the ability to make judgments on simple work-related decisions; understand, remember, and carry out complex instructions; and markedly restricted in the ability to make judgments on complex work-related decisions. (*Id.*). He based these opinions on Claimant's moderately deficient judgment and insight, and her mildly impaired concentration and short term memory. (*Id.*). Mr. Lester found Claimant moderately restricted in her ability to interact appropriately with the public and supervisors, but markedly restricted in her ability to interact appropriately with co-workers and respond appropriately to changes in a routine work setting. (Tr. at 1007). He based these opinions on Claimant's diagnosis of bipolar disorder 1, most recent episode depressed, moderate without psychotic features; nightmare disorder; cannabis abuse; pain disorder associated with both psychological factors, and her general medical conditions; her history of fibromyalgia; arthritis; IBS; migraines; gout; GERD; and diverticulitis. (*Id.*).

## VI.    **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.   **Discussion**

Having thoroughly considered the issues and evidence, the undersigned concludes that none of Plaintiff's three challenges provides a basis for reversal or remand in this case. As will be discussed in greater detail below, Plaintiff erroneously conflates the SSA's two-step process for evaluating the effect of drug and alcohol abuse on a finding of disability with the five-step sequential process used to make the initial determination of disability. In addition, she ignores the ALJ's discussion of Claimant's pain symptoms and diagnosis of fibromyalgia when conducting the credibility analysis; thus, her challenge of the credibility finding is without merit. Lastly, Plaintiff relies on a

faulty foundation to support her argument that Claimant's severe impairment of carpal tunnel syndrome required additional limitations in the RFC findings.

### A.  Claimant's Marijuana/Polysubstance Abuse

Title 42 U.S.C. § 1382c(a)(3)(J) states that "[a]n individual shall not be considered disabled ... if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." Thus, if a claimant is determined to be disabled under the five-step sequential evaluation process, but is also found to have a drug or alcohol addiction, the ALJ must assess whether the addiction is a substantial contributing factor to the claimant's disability. Title 20 C.F.R. § 404.1535 sets out how this assessment is made:

> (a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability, unless we find that you are eligible for benefits because of your age or blindness.
>
> (b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.
>
> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
>
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>
> (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>
> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will

find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

As the regulation explicitly indicates, the two-steps used to analyze the materiality of drug or alcohol abuse are not triggered unless (1) there is a finding of disability; and (2) there is medical evidence of "drug addiction or alcoholism."

Plaintiff contends that the ALJ committed reversible error by "failing to perform the required analysis" to assess the materiality of Claimant's marijuana/polysubstance use. (ECF No. 14 at 13). Plaintiff is wrong. Given that Claimant was found not disabled, the ALJ was not required to evaluate the specific role that marijuana and other drugs played in Claimant's functional limitations. See *Jones v. Commissioner of Soc. Sec.*, Civil No. SAG−13−2314, 2014 WL 1877608, at *2 (D.Md. May 7, 2014) ("Drug addiction and alcoholism ("DAA") become a material issue only where the Commissioner determines that a claimant is disabled considering all of the claimant's medically determinable impairments"); *see also* Social Security Ruling 13-2p, 2013 WL 621536, at *2 (S.S.A. Feb. 20, 2013). Plaintiff's additional assertion that the ALJ's failure to conduct this analysis allowed her to underestimate the mental health issues that plagued Claimant is similarly without merit. Plaintiff specifically argues that the ALJ "discounted" Claimant's hospitalizations that involved drug use; thereby, failing "to properly evaluate the question of how much impact the drug use had on [Claimant's] periods of decompensation and hospitalizations—a significant question in the evaluation of whether a claimant meets or equals the mental Listings of Impairments." (ECF No. 14 at 13). According to Plaintiff, if the ALJ had properly considered Claimant's polysubstance abuse to be a severe impairment, "the ALJ may have been compelled to find that some of [Claimant's] documented episodes of mental health decompensation

be counted as a true episode of decompensation instead of being ignored because 'she tested positive for illegal drugs during these hospitalizations.'" (*Id.* at 11).

In fact, in her evaluation of whether Claimant met the mental health listings, the ALJ mentioned Claimant's drug use in relation to two hospitalizations. (Tr. at 28). Nevertheless, the ALJ counted these hospitalizations as evidence of "two episodes of decompensation, each of extended duration." (*Id.*). Therefore, in terms of establishing the severity criteria of a mental health listing, the ALJ did not "ignore" or discredit the hospitalizations as Plaintiff suggests. While it is true that the ALJ did not count other hospitalizations, her decision not to count them was explicitly unrelated to Claimant's drug use. Instead, other hospitalizations were not counted because no records were in evidence to substantiate the details of the admissions. (*Id.*). Thus, it was a lack of evidence, rather than a history of polysubstance abuse, that prevented Claimant from establishing the "repeated" episodes of decompensation of extended duration needed to meet a listing.[2]

In her reply brief, Plaintiff emphasizes an argument she raised fleetingly in her initial memorandum. She contends that the ALJ erred by not finding Claimant's polysubstance abuse to be a severe impairment at the second step of the sequential evaluation process. As the Commissioner states, however, the record does not support Plaintiff's contention that Claimant's drug use was a severe impairment. Indeed, her long-standing habit of using marijuana and her periodic abuse of benzodiazepines are mentioned in the treatment records, but they are not prominent in the evidence and do

---

[2] The term "repeated episodes of decompensation, each of extended duration," means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 CFR Pt. 404, Subpt. P, App. 1, ¶ 12.00.

not consistently appear as a diagnosis or source of concern. In any event, courts in this circuit have held that failing to list a severe impairment at the second step of the process generally is not reversible error as long as any functional effects of the impairment are appropriately considered during the later steps of the process. *See McKay v. Colvin,* No. 3:12–cv-1601, 2013 WL 3282928, at \*9 (S.D.W.Va. Jun. 27, 2013); *Cowan v. Astrue,* No. 1:11-cv-7, 2012, WL 1032683, at \*3 (W.D.N.C. Mar. 27, 2012) (collecting cases); *Conard v. Comm'r,* Case No. SAG-12-2290, 2013 WL 1664370, at \*2 (D.Md. Apr. 16, 2013) (finding harmless error where Claimant made threshold of severe impairment regarding other disorders and "the ALJ continued with the sequential evaluation process and considered all of the impairments, both severe and non-severe, that significantly impacted [his] ability to work"); *Cook ex rel A.C. v. Colvin,* Case No. 2:11-cv-362, 2013 WL 1288156, at \*4 (E.D.Va. Mar. 1, 2013) ("The failure of an ALJ to find an impairment to be severe at Step 2, however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process."); *Mauzy v. Astrue,* No. 2:08–cv–75, 2010 WL 1369107, at \*6 (N.D.W.Va. March 30, 2010) ("This Court finds that it was not reversible error for the ALJ not to designate any of the plaintiff's other mental conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments."). Claimant's drug use and drug-seeking behaviors were properly considered by the ALJ when assessing Claimant's RFC. (Tr. at 31, 33).

Accordingly, the undersigned **FINDS** that the ALJ did not err in her treatment of Claimant's polysubstance use/abuse.

### B. Credibility Analysis

Social Security regulations and rulings require an ALJ to evaluate the credibility of a claimant's statements concerning pain and other symptoms using a two-step process. 20 C.F.R. § 404.1529. First, the ALJ must ascertain whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's alleged pain and symptoms. *Id.* § 404.1529(a). A claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's impairments could be expected to produce the alleged pain and other symptoms, the ALJ must evaluate the intensity, persistence, and severity of the pain to determine the extent to which it prevents the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence or severity of the pain and symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-

treating sources, *id.* § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical

source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Thus, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not replace its own credibility assessments for those of the ALJ; rather, the Court studies the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ acknowledged the two-step process and began by examining Claimant's allegations. The ALJ noted that Claimant alleged pain in her back and legs with muscle spasms in her back. (Tr. at 29). She complained that the carpal tunnel release surgeries had not decreased the pain, weakness, and limitations in her hands

and wrists. She alleged that she could barely move on occasion due to arthritis and fibromyalgia. Claimant stated that she was depressed, had panic attacks, could not handle stress, spent most of her time alone, and needed to take medications for both pain and depression. She described having days when she could not get out of bed. The ALJ found that Claimant's medically determinable impairments could reasonably cause the alleged symptoms and pain. However, the ALJ did not believe that Claimant suffered from pain and the other symptoms to the degree and with the persistence asserted by Claimant.

The ALJ explained her conclusion by first reviewing the objective medical evidence that contradicted Claimant's statements of the intensity, persistence, and limiting effects of her pain and symptoms. (Tr. at 30). She pointed out that the evidence demonstrated that Claimant had successful carpal tunnel release surgeries. Claimant's March 2012 examination for fibromyalgia reflected the absence of tender points. Claimant had a normal gait and was able to stand without difficulty. An x-ray was negative. According to a medical expert, Dr. Brendemuehl, Claimant's carpal tunnel syndrome and fibromyalgia were not disabling; rather, they could be properly accounted for by limiting Claimant to light exertional work with various postural and environmental restrictions. (Tr. at 30-31). The ALJ next discussed Claimant's psychological treatment over time, which included evidence of Claimant's drug-seeking behavior. The ALJ indicated that Claimant's manipulation of physicians for pain medications, her refusal to attend medical appointments when drugs were not forthcoming, and her continued use of marijuana all undermined her credibility. (Tr. at 32). The ALJ also considered the effects of Claimant's treatment as reflected in the record, and the side effects of her medications, which were noted to be none.

As to non-medical evidence, the ALJ reviewed Claimant's activities. (Tr. at 32). She stated that Claimant could perform all of her daily toiletries. Claimant was able to do housework, cook, do laundry, wash dishes, and take care of her children and pets. Claimant was also enrolled in a nursing program at Mountain State. Although Claimant needed help with some of these activities, the ALJ clearly found them to be inconsistent with Claimant's assertions of disability. Finally, the ALJ conducted a thorough review of the opinion evidence, affording different degrees of weight to the various opinions depending on how consistent the ALJ found the opinions to be with the rest of the evidence. (Tr. at 32-34). Contrary to Plaintiff's contention, the ALJ performed a thoughtful, comprehensive assessment of the Claimant's credibility that was fully compliant with the regulations and rulings. Moreover, the ALJ's ultimate conclusion that Claimant's statements were not credible in that they exaggerated the extent of her pain and mental distress was supported by substantial evidence.

As an additional element of error in performing the credibility analysis, Plaintiff maintains that the ALJ failed to give adequate consideration to Claimant's fibromyalgia. In Plaintiff's view, the ALJ's focus on objective medical information to discredit Claimant was "particularly egregious" given that the nature of fibromyalgia "is one that does not always present with objective testing." (ECF No. 14 at 16). Plaintiff argues that the ALJ should have evaluated the severity of Claimant's fibromyalgia using the criteria set forth in SSR 12-2p and should have provided better reasons for rejecting Claimant's statements of the limiting effects of her symptoms than to say that they were too "extreme," "not supported by the evidence," and not credible "'to the extent they are not [sic] inconsistent with' the RFC." (*Id.*).

Social Security Ruling 12-2p provides guidance on the evidence required "to establish that a person has a medically determinable impairment of fibromyalgia" and how to evaluate the limiting effects of the impairment. SSR 12-2p, 2012 WL 3104869, at *5 (S.S.A. 2012). Fibromyalgia is "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." *Id.* at *2. In Social Security Ruling 12-2p, the SSA explained that to establish the medically determinable impairment of fibromyalgia, a claimant must produce a physician diagnosis of fibromyalgia that is adequately supported by medical findings and is not inconsistent with other evidence in the record. *Id.* Relying upon publications of the American College of Rheumatology, the SSA outlined two sets of criteria for diagnosing fibromyalgia, either of which would support a physician's opinion that the impairment was present. Essential to both sets of criteria are (1) findings of widespread pain, "that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least three months," and (2) evidence that other disorders that could cause the symptoms and signs had been excluded. *Id.* at *2-3.

The first set of criteria, which is based upon the 1990 ACR Criteria for the Classification of Fibromyalgia, further requires the finding of "at least 11 [out of 18 designated] positive tender points on physical examination," which must be located bilaterally and both above and below the waist. *Id.* at *3. The second set of criteria, which is based upon the 2010 ACR Preliminary Diagnostic Criteria, requires "repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking

unrefreshed, depression, anxiety disorder, or irritable bowel syndrome." *Id.* Under this second diagnostic method, "signs" include certain "somatic symptoms" such as:

> muscle pain, irritable bowel syndrome, fatigue or tiredness, thinking or remembering problems, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms.

SSR 12-2p, 2012 WL 3104869, at *3 n.9. "Co-occurring conditions" include irritable bowel syndrome and depression, as well as "anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome." *Id.* at *3 n.10.[3]

Thus, in order to establish fibromyalgia as a medically determinable impairment under the second diagnostic criteria, a claimant must provide objective medical evidence establishing (1) a history of widespread pain, (2) repeated manifestations of six or more of the listed "somatic symptoms" or co-occurring symptoms, and (3) evidence excluding other disorders that could cause the repeated manifestations. *Id.* at *3. As the SSA explains, "[w]hen a person alleges fibromyalgia, longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of the impairment." *Id.*

Once fibromyalgia has been established as a medically determinable impairment, the Ruling confirms that the SSA will "follow the two-step process set forth in [the] regulations and in SSR 96-7p" to determine the claimant's resulting functional

---

[3] Both the somatic symptoms and co-occurring conditions are taken from Table No. 4, "Fibromyalgia diagnostic criteria," in the 2010 ACR Preliminary Diagnostic Criteria. *Id.* at *3 n.9 and 10.

limitations. *Id.* at *5. Consequently, SSR 12-2p does not require the ALJ to follow any different or special process in assessing the credibility of a claimant with fibromyalgia. Moreover, the Ruling does not suggest that statements by a claimant with fibromyalgia should be given more weight simply because the condition does not always present with objective findings. Instead, the Ruling expressly provides that once the diagnosis is established, the ALJ should follow precisely the same process for determining the credibility of statements regarding pain and other symptoms by a claimant with fibromyalgia as is customarily used with any claimant.

Furthermore, Plaintiff's assertion that the ALJ's summary statements render her explanation inadequate is unavailing. While the ALJ's use of boilerplate template language was perhaps ill-advised, she performed an appropriate analysis and her determination is supported by substantial evidence. *See Mascio v. Colvin,* No. 2:11–CV– 65–FL, 2013 WL 3321577, at *3 (E.D.N.C. July 1, 2013) (holding that the ALJ's use of the same boilerplate language "is not an error [and] does not require remand" if the ALJ has otherwise performed and explained his conclusions adequately); *Wilds v. Colvin,* No. 1:13cv318, 2015 WL 339643, at *7 (M.D.N.C. Jan. 23, 2015) (same); *Thompson v. Colvin,* No. 7:13cv00032, 2014 WL 4792956, at *14 (W.D. Va. Sept. 25, 2014) (holding that use of boilerplate language is acceptable as long as the ALJ adequately explains his credibility findings).

Accordingly, the undersigned **FINDS** that the ALJ performed a proper and reasonable credibility analysis and provided a sufficient explanation for her decision to discount the credibility of Claimant's statements regarding the severity and persistence of her pain and symptoms, in accordance with governing regulations and rulings.

### C. Claimant's Carpal Tunnel Limitations

Finally, Plaintiff asserts that the ALJ erred by not including limitations in the RFC findings to address Claimant's severe impairment of carpal tunnel syndrome. (ECF No. 14 at 17). Plaintiff argues that Claimant testified that she had pain and weakness in her hands and wrist post bilateral carpal tunnel release surgery, yet the ALJ did not include any restrictions in the RFC finding related to fingering, handling, or grasping.

Plaintiff's challenge on this ground is unpersuasive because it is based on a fundamentally flawed premise. Claimant apparently presumes that simply because the ALJ found carpal tunnel syndrome to be a severe impairment at step two of the process, she was bound to include functional limitations in the RFC finding to account for carpal tunnel syndrome. "To the extent [Claimant] suggests that a finding of severe impairment at Step 2 necessarily requires limitations on a claimant's ability to perform basic work activities, this argument has no merit." *Burkstrand v. Astrue,* 346 F.App'x 177, 180 (9th Cir. 2009); *see also Walker v. Colvin,* No. C13–3021–MWB, 2014 WL 1348016, at *7 (N.D.Iowa Apr.3, 2014) ("A finding of a severe impairment at Step Two does not require the ALJ to provide related functional limitations at Step Four."); *Hughes v. Astrue,* No. 1:09CV459, 2011 WL 4459097, at *10 (W.D.N.C. Sept. 26, 2011) (holding that a finding of impairment at step two is not "proof that the same limitations have the greater significant and specific nature required to gain their inclusion in an RFC assessment at step four."). As was demonstrated by the ALJ's review of the records, the opinions of the medical sources, and the lack of testimony by the medical expert focused on hand/wrist limitations, whatever residual problems Claimant may have had from carpal tunnel syndrome, the evidence did not support a finding that they caused more than a minimal impact on her ability to manipulate. No medical source

recommended specific restrictions related to Claimant's fingering, handling, or grasping, and the medical records did not justify such restrictions.

Therefore, the undersigned **FINDS** that the ALJ's RFC finding was supported by substantial evidence despite the lack of manipulative limitations.

## VIII.  **Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's motion for judgment on the pleadings, (ECF No. 14); **GRANT** Defendant's motion for judgment on the pleadings (ECF No. 17), **AFFIRM** the final decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S.

140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** February 19, 2015

Cheryl A. Eifert
United States Magistrate Judge